DOROTHY V. BOND *vs.* CHARLES W. BOND.

Kennebec.   Opinion April 12, 1928.

*Locke, Perkins & Williamson,* for libellant.
*Frederick G. Katzman,*
*John H. Vahey,*
*Frederick J. Laughlin,*
*Jacob H. Berman,* for libellee.

SITTING: WILSON, C. J., PHILBROOK, DUNN, BARNES, BASSETT, PATTANGALL, JJ.

WILSON, C. J. A libel for divorce on which a decree was made by the Judge of the Superior Court for the county of Kennebec granting a divorce to the libellant. It comes to this Court on exceptions by the libellee to the decree granting the divorce and to numerous rulings made by the justice below.

Prior to the hearing, the libellee filed a motion under section 98, chapter 82 R. S., that the cause be transferred to the Supreme Judicial Court, assigning as the ground, in the language of the statute, that the judge of the Superior Court was disqualified by reason of "interest, relationship, and other lawful causes."

To this motion was attached an affidavit of the libellee setting forth specifically the grounds constituting the alleged disqualification. Prior to the hearing on the motion, the Judge detached the affidavit from the motion, on the ground that it contained matters that were irrelevant, inadmissible in evidence, false, and scandalous, and refused to receive it or permit it to be placed upon the files of the Court.

Counsel for the libellee then offered the affidavit as evidence bearing on the motion. The affidavit was thereupon excluded as evidence. To the rulings of the Court that the affidavit was not properly a part of the motion and that the libellant had a right to be heard upon the motion, exceptions were taken by the libellee

and allowed. Exception was also taken and allowed to the refusal to receive the affidavit as evidence and to a refusal to strike out certain evidence and to the denial of the motion.

During the hearing on the libel, exceptions were also taken to the admission of evidence describing the wedding and the class of people attending and to the admission and exclusion of certain testimony and to the refusal to strike out certain answers as unresponsive. None of these exceptions, however, are strenuously urged.

The only exceptions seriously argued before this Court were the exceptions above noted taken at the hearing on the motion to transfer the cause to the Supreme Judicial Court; the exceptions to the admission of certain conversations or statements by the libellee to the libellant when no one else was present upon the ground that they were privileged; and an exception to the decree granting the divorce.

We have examined all the exceptions taken to the admission and exclusion of evidence and to the refusal to strike out certain testimony. and find no error in the rulings of the Court below, or if technical error appears in any instance, it does not appear that the libellee was aggrieved thereby.

The exceptions to the rulings of the judge in connection with the hearing and refusal to grant the motion to transfer the cause must be overruled.

The Superior Court of Kennebec county is a local court with a single presiding justice. Upon its creation, P. L. 1878, chapter 10, the Legislature provided that in the event of the disqualification of the judge to hear any case by reason of "interest or any lawful cause, the case shall be transferred to the Supreme Judicial Court for that county." This provision has been retained and with the insertion of the word "relationship" as a ground, is now found in Sec. 98 of Chapter 82 R. S. under which the motion in this case was filed. .

The statute does not prescribe the proceedings by which the question of disqualification may be raised. In many states, as in Kentucky, the filing of an affidavit is required by statute, and, if sufficient on its face to disqualify, the judge can not sit. *Powers* v. *Com.*, 114 Ky., 237; also see *People* v. *Compton*, 123 Cal., 403;

*Henry* v. *Spear*, 201 Fed. R., 869. Whether the rules of the Superior Court for Kennebec county require such a motion to be supported by an affidavit does not appear from the record. On general principles, it would seem to be a proper procedure. *Gifford* v. *Clark*, 70 Me., 94. If the motion or accompanying affidavit contained irrelevant, false, and scandalous matter tending to improperly bring the presiding justice into disrepute, we have no question of the authority of the judge to order the irrelevant and scandalous matter to be striken out, leaving only such statement of facts as might properly be considered in support of the petition.

However, if a supporting affidavit is filed under the rules of court, or in accordance with a general practice in case of motions based on facts outside the record, it is not done in the interest of the moving party, but to show his good faith and apprise the Court and the other party of the grounds on which the motion is based. To detach it from the motion, therefore, could not prejudice the moving party in the case, no advantage being taken of the lack of it, and when, as in the case at bar, he was permitted to offer presumably all evidence in his possession in support of the motion. It is only by virtue of a statute that an affidavit is alone held a sufficient ground for recusation in other jurisdictions.

Nor do we think the libellee was aggrieved by the ruling of the Court that the libellant had a right to be heard on the issue raised by the motion, or the refusal to receive the affidavit as evidence. It contained matter obviously based on hearsay, and inasmuch as all the oral evidence the libellee offered in support of the facts contained in the affidavit was received, in no event was he aggrieved by its exclusion. Every litigant is interested in the tribunal before which his cause shall be heard. The libellant in this case had selected, as she had a right to do, one of two courts having jurisdiction in the county. She also had a right to be heard on an issue, which if the motion was well grounded, involved her own good faith.

The issue raised by the exception to the dismissal of the motion is whether the facts proven by the evidence offered in support of the motion, as a matter of law, disqualified the presiding justice from hearing the cause. The grounds for disqualification

now named in the statute are "interest, relationship, or other lawful cause." The "interest" referred to in such a statute is some pecuniary interest in the outcome of the case. It is not claimed that either interest of this nature or disqualifying relationship exist here. The only question, therefore, is what disqualifying grounds are included in the phrase, "other lawful cause"; and whether any such grounds so clearly existed as to render a ruling to the contrary by the judge below error in law.

At common law, the only ground for recusation of a judge was pecuniary interest or relationship. Bias or prejudice was not sufficient. 3 Blackstone Com. *p361; *Fulton* v. *Longshore*, 156 Ala., 611, 613; *Bryan* v. *State*, 41 Fla., 643, 658-9; *in re* Davis Est. 11 Mont. 1, 18; *People* v. *Compton*, 123 Cal., 402, 413; *McCauley* v. *Weller*, 12 Cal., 500; *Clyma* v. *Kennedy*, 64 Conn., 310; *Elliott* v. *Hipp*, 134 Ga., 844, 848; *Turner* v. *Com.*, 59 Ky., 619, 626; *Russell* v. *Belcher*, 76 Me., 501.

"By the laws of England in the time of Bracton and Fleta," says Blackstone, "a judge might be recused for good cause, but the law is now otherwise; and it is held that judges and justices can not be challenged, for the law will not suppose a possibility of bias or prejudice in a judge who is sworn to administer impartial justice."

"The presumption is that the court will not be influenced by the animosities of the *judge*, if such he has," *Allen* v. *Reilly*, 15 Nev., 452.

In California in 1859, the only grounds fixed by the statute as sufficient to disqualify a judge were: "(1) when the judge were a party or interester; (2) when he was related to one of the parties within the third degree; (3) when he had been attorney or counsel for either party." In *McCauley* v. *Weller*, supra, the Court said: "These are the only causes which work a disqualification of a judicial officer. The exhibition by a judge of partisan feeling or the unnecessary expression of opinion upon the justice or merits of the controversy, though exceedingly indecorous, improper, and reprehensible as calculated to throw suspicion upon the judgments of the court and bring the administration of justice into contempt are not under our statute sufficient to authorize a

change of venue on the ground that the judge is disqualified from sitting."

The modern trend has been to add by legislation other grounds of recusation to those recognized at common law, *Johnson* v. *State*, 31 Tex., Crim. Rep., 456, 467-8, and cases above cited and in a few cases the courts have held other grounds than those recognized at common law sufficient to disqualify, *Moses* v. *Julian*, 45 N. H., 52, 56.

In the latter case, the court laid down in addition to interest and relationship the following as sufficient grounds for disqualification: (1) when the judge has received important benefits or donation from either party, (2) when the relation of master and servant or guardian and ward existed; (3) when a lawsuit was pending between the judge and one of the parties or he had indicated enmity by declarations or threats shortly before the suit; any one of which would be clearly sufficient for a judge to refuse to sit.

In some cases when a judge has himself found that he had a bias or prejudice for any reason, it has been held sufficient to authorize a substitute to hear the case. *Williams* v. *Robinson*, 6 Cush., 333.

In *Lovering* v. *Lamson*, 50 Me., 334, however, this court held that an attorney who had advised a poor debtor, was not thereby, as a matter of law, disqualified from acting as a justice on his disclosure under the statute.

*In re* Cameron, 126 Tenn., 615, 649, the Tennessee Court says: "Several of the states have statutes upon this subject laying down the rule that this (personal prejudice) will make a judge incompetent. We have no such statute. Moreover, we doubt the policy of such legislation. It is entirely conceivable that an upright and honored judge may decide justly and impartially as between his bitter personal enemy and his warm personal friend, administering the rules of law without fear or favor."

The above cases disclose the general trend of legislation and judicial decisions. The statutes defining the grounds of recusation have in many states added to "interest and relationship" such additional grounds as "or otherwise disqualified," "can not properly preside," "otherwise unable," "other disability" "or any legal cause"; and such general phrases have generally been held to in-

clude bias or prejudice as a sufficient ground. *In re* Peytons Appl., 12 Kan., 311; *Turner* v. *Com.*, supra; *Williams* v. *Robinson,* supra; *Gill* v. *State,* 61 Ala., 169.

While at the time of the enactment of the original act, now found in Sec. 98, Chap. 82 R. S., this Court had not recognized in addition to that of pecuniary interest, except that of relationship, any "other lawful cause" as a conclusive ground for recusation of a judge, we think the Legislature, in view of the trend of legislation on this subject and the inherent right of litigants to have their cases heard before an impartial tribunal, *Russell* v. *Belcher,* supra, by retaining the phrase "other lawful cause, in addition to the recognized grounds of disqualification at common law, must have intended that bias or prejudice on the part of the presiding judge such as, if established, would deprive a litigant of this fundamental right, was a sufficient ground for transfer of the cause.

We shall not attempt to define all the conditions that would disqualify a judge on this ground. Each case must rest on its own facts. Bias or prejudice is a personal matter with the judge. He may have bias or prejudice against or in favor of one of the parties, and still hold the scales of justice evenly. Only in cases where pecuniary interest or relationship within the prohibited degree are shown does the law conclusively presume disqualification. In all other cases where disqualification is alleged, it must be shown that a disqualifying bias or prejudice actually exists. The presiding judge must himself determine, unless by statute otherwise provided, whether such bias or prejudice exists and to such a degree that he can not lay it aside and impartially preside between the parties. Unless clearly shown by acts or declarations, only he can search his own mind and determine that fact.

Our government is a "government of laws and not of men." In addition to their legal learning, judges are presumably selected because of their ability to lay aside personal prejudices and to hold the scales of justice evenly. The presumption is that they will do so.

A local judge of necessity must have embarrassing situations arise by reason of his acquaintance in the community in which he resides. Judges can not be selected from cloisters nor compelled to live in seclusion. It is their duty unless disqualified to hear

every case brought before them. He can not refuse to discharge that duty simply because he happens to know more or less intimately one of the parties. Social relations *ipso facto* do not disqualify, as do pencuniary interest or relationship; and no case should be transferred unless such bias or prejudice actually exists on the part of the judge that he can not lay it aside.

If conscious of any such prejudice, a judge ought not to sit, and should withdraw *suo motu;* but unless it clearly appears from the evidence that he is disqualified by such a deep-seated bias or prejudice that he could not impartially preside, or that the presence of such bias or prejudice is the only inference which can be drawn from the evidence in support of a motion to transfer, it can not be said on exceptions there is error in law in his denial of the motion.

The evidence in the case at bar in support of the motion only goes to show intimate social relations between the family of the libellant and that of the presiding justice, as indicated by occasional dinner parties at the homes of each, social calls, automobile trips with an exchange of autographed photographs of the presiding justice and of the libellant, whom he and his wife had favorably known since childhood, all of which was admitted by the parents of the libellant and the libellant herself upon being called to the stand by counsel for the libellee. The libellee did not take the stand or offer any evidence in support of any of the other allegations contained in the affidavit. We must, therefore, assume that they could not be substantiated.

Notwithstanding the close friendship admitted to exist between the two families, the presiding judge must have found in denying the motion that he was not conscious of any such bias or prejudice in favor of the libellant or against the libellee as would prevent him from impartially presiding in the case.

It can not be said that a disqualifying bias or prejudice as a matter of law must necessarily have existed from such relations, or that the only inference arising from the evidence offered in support of the motion is that the presiding justice could not eradicate from his mind any friendly feeling he might have for the libellant or her family by reason of their close social relations and impartially decide the case; nor do we think it follows from the result that he did not so decide.

The exceptions to the admission of the evidence classed as private conversation between the libellant and libellee must also be overruled.

At common law, no person interested, whether a party or not, was permitted to testify. In 1855, chap. 181, the Legislature of this state lifted the ban on other "persons interested," but left the parties to the cause still disqualified. In 1856, chap. 266, the ban was removed on the parties ; and in 1859, chap. 102, a husband or wife of a party was permitted to testify, but only with the other's consent. While these statutes might seem to permit both parties to a divorce action to testify, it was held in *Dwelly* v. *Dwelly*, 46 Me., 377 that, while it removed the ban as to parties, there were other grounds for excluding a husband and wife as witnesses for or against each other, viz., that of public policy by reason of its tending to cause marital friction and domestic strife. This was confirmed in *Walker* v. *Sanborn*, 46 Me., 470, 472. The cases of *Drew* v. *Roberts*, 48 Me., 36 and *Thompson* v. *Wadleigh*, 48 Me., 66 are not *contra* to the rule laid down in *Dwelly* v. *Dwelly*. Both recognize the rule excluding the testimony of husband and wife for or against each other as grounded on public policy, and hold that, while the statute of 1859 removed the latter ground, it was applicable only where the other assented, and only one was a party.

Whether the rules of disqualification on the ground of public policy should be applied in cases where the interests of husband and wife are hostile, see Spitz Appl., 56 Conn., 184, is now a moot question in case of a libel for divorce. The ban has been expressly removed by the statute of 1863, chap. 211, and now found in section 2, chapter 65 R. S., permitting either party to the libel to testify.

These statutes do not in terms, however, reach the point now in issue, viz., whether they also removed the ban on what in the law of evidence are termed privileged communications, which has nothing to do with the competency of the husband or wife as witnesses. While the exclusion of the husband and wife as witnesses and of privileged communications between them are both based on public policy, one rule excludes the testimony because of the source from which it comes, the other, because of its nature.

Attorneys and clients, and pastor and parishioner, when parties, are all competent witnesses under the acts of 1855 and 1856, but that does not make their confidential communications admissible. The removal of incompetency of husband and wife as witnesses in divorce cases does not permit either to disclose confidential communications induced by the marital relations. Ex parte Belville, 58 Fla., 170; *McCormick* v. *State*, 135 Tenn., 218; *Williams* v. *Beltz.*, 29 Del., 554; 27 L. R. A. (N. S.) 273 note.

Some states in removing the ban of incompetency from husband and wife have made express exceptions of such communications. The statute in Massachusetts excludes all "private conversations" between husband and wife. *Fuller* v. *Fuller*, 177 Mass., 184; 29 A. L. R. 412, 422. The common law rule of privileged communications, however, does not go so far as to exclude all conversations between husband and wife when no one else is present.

Marital secrets induced by the relations thus existing, confessions and admissions confidential in their nature and all communications that can be said to be induced by the confidence presumed to be inherent to the marital relations are privileged and can not be disclosed by either without the consent of the other, *Myers* v. *Myers*, 158 Mo. Appl., 299; Greenleaf Ev. Vol. 1, sec. 254; yet conversations may be had between husband and wife which are in no sense confidential or induced by the marital relations, 28 R. C. L. 526, 527; *Owen* v. *State*, 78 Ala., 425; *Toole* v. *Toole*, 112 N. C. 152; 29 A. L. R. 412. Even the Massachusetts court holds that abuse on the part of one, if not in conversation, is admissible. *French* v. *French*, 80 Mass., 186.

It would seem like a strained construction, however, if one party continually indulges in abusive language and the calling of vile names and the other remains silent under it, it is admissible; but if he or she replies and conversation takes place, it becomes inadmissible.

Abuse with the tongue, whether in the course of conversation or otherwise and whether in the presence of others or not, is not warranted or induced by the marital relations, is not ordinarily of confidential nature, and as an act of cruelty is, therefore, admissible in support of an allegation of cruel and abusive treatment.

Applying these rules to the evidence objected to, surely an invitation by the husband to the wife to drink liquor saying it would brace her up after a long journey is not a communication of a confidential nature, induced in any degree, by the ties, which in this case had just been assumed, but rather a communication that might be addressed to any guest or traveling companion. Nor was an invitation on a boat during their honeymoon to go to the bar room, where he was enjoying himself in the company of congenial spirits and have a "good time" instead of remaining alone on deck, of the nature of a confidential communication that would be addressed only to a wife by reason of their confidential relations, or which appears from the evidence to have been addressed to her in confidence.

The only other statement or communication, to the admission of which on this ground an exception was taken and included in the bill of exceptions, was a statement or statements of his that he had "great power over women."

We can conceive of an admission of this kind in excuse of some conduct of the husband, if made in the course of a family conference in which confidential matters of this nature were under discussion, which would and ought to be held to be privileged; but the statement in this case clearly appears from the libellant's testimony to have been made not as a confidential communication to the wife, but in the spirit of boasting of his attractions for the other sex, and of conquests he had won, or for the purpose of taunting his young wife. Such assertions made in such a spirit as the libellant's testimony shows the statements included in the bill of exceptions were made, clearly were not made in confidence or induced by their relations of husband and wife, and were properly admitted. None of the statements set forth in the bill of exceptions were of a confidential nature or such as might not have been made to any friend or companion.

We now come to the final question as to whether, taking the evidence of the libellant to be true, the decree granting the divorce was erroneous as a matter of law. *Michels* v. *Michels*, 120 Me., 395. The question here on exceptions is not what conclusion this Court might have reached upon all the testimony, but whether

there was any evidence to warrant the findings of facts for which the legislature of this state has said a divorce shall be decreed.

This Court can not review the findings of a single justice on questions of facts. He is the exclusive judge of the credibility of witnesses and the weight of the evidence; and only when he finds facts without evidence or contrary to the only conclusion which may be drawn from the evidence is there any error of law. *Chabot & Richards* v. *Chabot*, 109 Me., 403; *Costello* v. *Tighe*, 103 Me., 324; *McLeod* v. *Amero*, 111 Me., 216; *Ayer* v. *Harris*, 125 Me., 249.

Unless inherently improbable, this Court must assume that the Judge below accepted as the more credible the testimony in favor of the party in whose favor his decision is made. In the case at bar, the evidence was conflicting, but it can not be said that the evidence of the libellant and her witnesses on any material point was inherently improbable. The same can not be said of that of the libellee, who testified that a bride of a year who had made no complaints whatsoever of his treatment, except on one occasion, and indeed was without any ground for complaint, but had joined him in his pleasures of drinking and smoking, had expressed pleasure at the prospect that she was within the coming months to become a mother in which he also joined; and that in a confidential conference just before her leaving home, in which any errors either may have made during the period of their married life were frankly discussed and a mutual agreement entered into to avoid them in the future, with mutual expressions of satisfaction so far with their married life, followed by the closest of marital relation, and yet within three days abandoned the home without any apparent change in their relations occurring, and without assigning any reason whatsoever, except that she no longer loved him.

If the court below accepted at its face value the essential parts of the libellant's testimony and that of her supporting witnesses, as this Court on exceptions must assume he did, *Michels* v. *Michels*, supra, he could have found as facts: that the libellant was a young girl twenty-one years old at her marriage and the libellee twenty-nine, that she had been accustomed to a home life of refinement where the practice of drinking intoxicating liquors and of

smoking by women was not tolerated; that she was a girl of intelligence; healthy and normal in her physical functions, except on one or more occasions during her school days she had experienced a suppression of her menses for two months; ambitious to make a success of her married life, well educated, of excellent social standing and her parents of abundant means; that, on the other hand, the libellee was a graduate of the school of experience, matured by business cares since the age of fifteen and by service in the World War; without means, or special social standing; that immediately upon their marriage, he began to encourage the libellant to drink intoxicating liquors with him, which she always refused to do, it being well known to him that it was contrary to her home training; that he continued his efforts in this respect by inviting and taking her to places where men were drinking and subjected her to more or less annoying attentions from them and finally went so far as to surreptitiously insert liquor in a harmless beverage they were accustomed to drink in their own home; that, notwithstanding he was paid a much larger salary by the company, of which her parents were the sole owners, that he had ever before received, viz., at the rate of six thousand and later seventy-two hundred dollars per year, and the libellant was allowed in addition by her father fifteen, and later, eighteen hundred dollars a year for her personal and household expenses, yet the libellee continually complained of the need of more money and demanded that she obtain more from her parents, turn over to him her personal bank account, and prevail on her parents to purchase a very large and expensive residence; and when his efforts to obtain more funds from this source failed, became indifferent, and finally in the presence of her parents told her that their marriage was a failure, that she had not profited by his teachings during the year of their married life, and then later taunted her with the fact that her parents did not openly take her part during his criticism of her conduct in their presence, and following this and three days before she left gave her in their own home another "lacing," as he described it to one or more of his business associates, and told her "where she got off," that he was through, and if she did not like it she could get out, that he did not propose longer to live with her as man and wife, although she had already previously informed

him that she was probably pregnant, a communication which he received with the brutal remark, "Well that's a H—l of a mess," as a result of which she left the room in tears and spent a sleepless night.

It is unnecessary to review the testimony in all its details or comment on other annoyances, some of a trifling nature, except as adding in some degree to the effect of the more serious ones above enumerated. The effect of all of which, as the libellant testified, was to cause her to have frequent spells of crying, sleepless nights, severe headaches, a supression of menses for a period of four months, and produced a state of nervousness, and undermined her health to the point where, as she expressed it to her mother when announcing her decision after nearly a year of uncomplaining endurance, she must leave or she would become a physical wreck, a conclusion corroborated by the testimony of her family physician who had known and attended her since childhood, and to which conditions the physician attributed the suppression of the menses, she having resumed her normal functions after two months freedom from the treatment described.

The only other question involved is whether such treatment as she has testified to amounts in law to cruel and abusive treatment within the meaning of the statute.

It is urged by counsel for the libellee that there is no evidence of conscious motive or intent to cause the libellant any mental pain, that if his personal habits did cause her mental suffering it was one of those consequences of marital life which each spouse must endure and overlook, citing in support of this rule *White* v. *White*, 105 Mass., 325; *Freeborn* v. *Freeborn*, 168 Mass., 50; *Armstrong*, v. *Armstrong*, 229 Mass., 592; *Ring* v. *Ring*, 118 Ga., 183.

This Court, however, has never adopted this rule and we do not deem a literal application of it consonant with the intent and purpose of this class of legislation. The purpose of the legislature in authorizing divorce is not to punish the guilty party for an offense in which his motive is essential but to relieve the other party from an intolerable position if it threatens his or her life or health. A course of treatment so brutal or bestial as to seriously endanger the health of a wife is none the less cruel, regardless of the motive with which it is done, if a husband knows the effect of his treat-

ment upon his wife or should have known it. He must be presumed to have intended its consequences, if he continues it. *Fleming* v. *Fleming*, 95 Cal., 430, 435; *Pardy* v. *Montgomery*, 77 Cal., 326; *Carpenter* v. *Carpenter*, 30 Kan., 712; *Goff* v. *Goff*, 60 W. Va., 9, 17; 73 Am. Dec. 624, note.

Practices or habits that may annoy a wife or husband and even cause mental pain and suffering, but not to the extent of endangering health may have to be borne. The law does not ensure perfect marital bliss, but the legislature has directed the courts of this state to grant an absolute divorce when a continued course of treatment has so affected the other party that his or her health and perhaps eventually life is jeopardized. *Holyoke* v. *Holyoke*, 78 Me., 404. The language of the court in this case has apt application to the facts in the case at bar:

> "Deplorable as it is, from the infirmities of human nature, cases occur where a wilful disregard of marital duty, by act or word, either works, or threatens injury, so serious, that a continuance of cohabitation in marriage can not be permitted with safety to the personal welfare and health of the injured party. Both a sound body and a sound mind are required to constitute health. Whatever treatment is proved in each particular case to seriously impair, or to seriously threaten to impair, either, is like a withering blast, and endangers 'life, limb, or health,' and constitutes the (6) cause for divorce in the act of 1883. Such is the weight of authority."

*Pidge* v. *Pidge*, 44 Mass., 257, 261; *Bailey* v. *Bailey*, 97 Mass., 373; *Downy* v. *Downy*, 135 Mich., 265; *Reinhard* v. *Reinhard*, 96 Wis., 555.

There being evidence, therefore, from which the court below could have found that the health of the libellant was seriously affected and a continuance of the marital relations would probably result in even more serious consequences, and that it was due to a course of treatment which the court could have also found the libellee must have known was seriously affecting his wife, especially if in the delicate condition in which she believed herself to be in and of which he had been apprised, it is sufficient to satisfy the statute.

It is true a woman of different training or of less refinement or sensitiveness might not have been affected by the treatment described, but the court below may have found from the evidence that this libellant was ; and it is her case we are considering.

*Exceptions overruled.*